**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
EASTERN DIVISION**

EDDIE WAYNE GHOLSTON,

       Plaintiff,

vs.

CAROLYN W. COLVIN,
Commissioner of Social Security,

       Defendant.

No. 14-CV-2064-LRR

**ORDER**

---

### *TABLE OF CONTENTS*

*I.*    *INTRODUCTION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *2*

*II.*   *PROCEDURAL HISTORY* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *2*

*III.*  *FACTUAL BACKGROUND* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *3*

*IV.*  *STANDARD OF REVIEW* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *6*

    *A.*    *Review of ALJ's Decision* . . . . . . . . . . . . . . . . . . . . . . . . . . *6*
    *B.*    *Review of Report and Recommendation* . . . . . . . . . . . . . . . . . . . *8*

*V.*   *ANALYSIS* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *9*

    *A.*    *The Five-Step Disability Analysis* . . . . . . . . . . . . . . . . . . . . . . *9*
    *B.*    *Gholston's Obesity* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *13*
        *1.*   *Background* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *13*
        *2.*   *ALJ's decision* . . . . . . . . . . . . . . . . . . . . . . . . . . *13*
        *3.*   *Report and recommendation* . . . . . . . . . . . . . . . . . . *14*
        *4.*   *Parties' arguments* . . . . . . . . . . . . . . . . . . . . . . . *15*
        *5.*   *Application* . . . . . . . . . . . . . . . . . . . . . . . . . . . *16*
    *C.*    *Gholston's Intelligence Level* . . . . . . . . . . . . . . . . . . . . . . . *20*
        *1.*   *Background* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *20*
        *2.*   *ALJ's decision* . . . . . . . . . . . . . . . . . . . . . . . . . . *21*
        *3.*   *Report and recommendation* . . . . . . . . . . . . . . . . . . *22*

|   | 4. | *Parties' arguments* . . . . . . . . . . . . . . . . . . . . . . . . . . . . | *22* |
|---|----|----|----|
|   | 5. | *Application* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | *24* |
| **D.** | **Consultative Examinations and Medical Opinion Sources** . . . . . . . | **31** |
|   | 1. | *Background* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | *31* |
|   | 2. | *ALJ's decision* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | *33* |
|   | 3. | *Report and recommendation* . . . . . . . . . . . . . . . . . . . . | *34* |
|   | 4. | *Parties' arguments* . . . . . . . . . . . . . . . . . . . . . . . . . . . . | *35* |
|   | 5. | *Application* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | *37* |
| **E.** | **Vocational Evidence** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **43** |
|   | 1. | *Background* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | *43* |
|   | 2. | *ALJ's decision* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | *44* |
|   | 3. | *Report and recommendation* . . . . . . . . . . . . . . . . . . . . | *45* |
|   | 4. | *Parties' arguments* . . . . . . . . . . . . . . . . . . . . . . . . . . . . | *46* |
|   | 5. | *Application* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | *47* |

**VI.  CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **53**

## I.  INTRODUCTION

The matter before the court is Plaintiff Eddie Wayne Gholston's Objections (docket no. 16) to United States Magistrate Judge Jon S. Scoles's Report and Recommendation (docket no. 15).  The Report and Recommendation recommends that the court affirm the final decision of the Commissioner of Social Security ("Commissioner") denying Gholston's Title II application for disability insurance benefits and Title XVI application for supplemental security income ("SSI") benefits and that the court dismiss Gholston's Complaint (docket no. 3) with prejudice.

## II.  PROCEDURAL HISTORY

On October 7, 2014, Gholston filed the Complaint, seeking judicial review of the Commissioner's final decision.  On December 15, 2014, the Commissioner filed an Answer (docket no. 7).  On January 15, 2015, Gholston filed "Plaintiff's Brief" (docket no. 10).  On February 13, 2015, the Commissioner filed "Defendant's Brief" (docket no. 11).  On February 23, 2015, Gholston filed a Reply (docket no. 12).  On February 24,

2015, this matter was referred to Chief Magistrate Judge Jon S. Scoles for issuance of a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). On June 12, 2015, Judge Scoles filed the Report and Recommendation. On June 24, 2015, Gholston filed his Objections.

In Plaintiff's Brief, Gholston argues that there is not substantial evidence on the record as a whole to support the Administrative Law Judge's ("ALJ") determination of Gholston's residual functional capacity ("RFC") and the ALJ's determination that he is not disabled. Plaintiff's Brief at 11. He also argues that the ALJ failed to fully and fairly develop the record. *Id.* at 18. Finally, he contends that the testimony of a vocational witness did not provide substantial evidence for the ALJ's finding that jobs that Gholston can perform exist in significant numbers in the national or regional economy. *Id.* at 20. In Defendant's Brief, the Commissioner argues that substantial evidence supports the ALJ's RFC finding, that he properly developed the record and that substantial evidence supporting the entirety of his decision exists on the record as a whole. Defendant's Brief at 6-17.

### III. FACTUAL BACKGROUND[1]

Gholston was born in 1974 and completed the tenth grade before dropping out of school part way through the eleventh grade. Gholston states that, while in school, he was enrolled in "special education" classes for English and mathematics. On January 6, 2012, Gholston applied for both disability insurance benefits and SSI benefits with an alleged disability onset date of June 24, 2008.[2] His applications were initially denied on April 2,

---

[1] In the Report and Recommendation, Judge Scoles provides a more detailed factual background. Since neither party objects to the factual background in the Report and Recommendation and the court finds that Judge Scoles committed no plain error with respect to the factual background, the court adopts it and incorporates it herein.

[2] Gholston previously applied for SSI benefits on August 4, 2008 and on September 16, 2010. On September 16, 2010, Gholston also applied for disability insurance benefits.

2012 and were denied on reconsideration on May 21, 2012. On April 24, 2013, Gholston appeared via video conference with his attorney before ALJ Robert Milton Erickson for an administrative hearing. Both Gholston and a vocational expert ("VE"), Carma A. Mitchell, testified at the hearing. On June 25, 2013, the ALJ denied Gholston's claims, finding that he is not disabled and not entitled to disability insurance benefits or SSI benefits because he is functionally capable of performing work that exists in significant numbers in the national or regional economy. On August 8, 2014, the Appeals Council denied Gholston's request for review. Consequently, the ALJ's June 25, 2013 decision was adopted as the Commissioner's final decision. *See Davidson v. Astrue*, 501 F.3d 987, 989 (8th Cir. 2007) (noting that, where the Appeals Council denies review, the ALJ's decision becomes the final decision of the Commissioner).

The record contains an earnings report for Gholston for the period 1991-2012. From 1991 to 2010, Gholston earned less than $1,000 in eight of the 20 years and in two of those eight years (1995 and 2000) he had no earnings.[3] In the remaining twelve years, he earned between $1,449.87 and $10,189.19. Administrative Record at 253-54. He has had limited earnings since 2010. *Id.* at 277. However, the ALJ determined that Gholston has not engaged in substantial gainful activity since the alleged disability onset date. *Id.* at 21.

At the administrative hearing, Gholston testified that he can "barely" read and write, "somewhat" knows how to use a computer and would be unable to make change for a five dollar bill without writing it down. *Id.* at 66-67. During the hearing, the ALJ provided Mitchell with a hypothetical for an individual matching the ALJ's eventual

---

All three applications were denied.

[3] At the administrative hearing, Gholston testified that he was incarcerated around 1999 or 2000, again around 2003 or 2004 and again in 2011. Administrative Record at 52, 57-58.

determination of Gholston's RFC. Mitchell testified that such an individual could perform two jobs: (1) document preparer, with 350 positions in Iowa and over 32,700 nationally and (2) addresser, with 200 positions in Iowa and 25,000 nationally. *Id.* at 75-76. When Gholston's counsel questioned Mitchell as to the extent that the document preparer and addresser positions required the use of both arms, Mitchell opined that a person in those positions could frequently use their dominant hand and would still be able to perform the job, but noted that the Dictionary of Occupational Titles ("DOT") and its supplements did not distinguish the extent that the positions required the use of both arms. *Id.* at 78-79.

In his decision, the ALJ determined that Gholston had the following severe impairments: "[1] left shoulder tear, [2] status post gunshot wound to the right lower extremity, [3] obesity, [4] left foot/ankle pain due to changes in hardware, [5] affective disorder, [6] anxiety disorder, and [7] polysubstance abuse." *Id.* at 22. The ALJ then determined that Gholston had the following RFC:

> [Gholston can] perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) and SSR 83-10 except for the following limitations: [he] can lift and/or carry 10 pounds frequently; he can stand and/or walk for two hours out of an eight-hour workday with regular breaks and standing for no more than five minutes continuously and walking for no more than 20 minutes continuously; he can sit for six hours out of an eight-hour workday with regular breaks and sitting for no more than 30 minutes continuously; he can never stoop, crawl, or kneel; he can occasionally perform gross manipulation with the left upper extremity; he must avoid concentrated exposure to dust, fumes, or temperature extremes; and he is limited to performing simple repetitive tasks with no more than occasional interaction with the public and co-workers.

*Id.* at 23. In arriving at this determination, the ALJ considered the "opinions of the State agency review physicians, the opinions and findings of the consultative examiners, the findings and opinions of [Gholston's] treating physicians, [Gholston's] testimony, his behavior at the hearing, his past medical history, his educational background, and the

diagnostic and clinical findings of record." *Id.* at 27. In doing so, the ALJ attempted to "strike a balance" between the sometimes-conflicting evidence, and stated that the RFC finding was "based upon independent proper weighing of all the medical and non-medical evidence." *Id.* at 27, 29. Finally, the ALJ determined that Gholston cannot perform his past relevant work, but can perform work that exists in significant numbers in the national or regional economy and is, therefore, not disabled. *Id.* at 29-31.

## IV. STANDARD OF REVIEW

### A. Review of ALJ's Decision

The ALJ's decision not to award disability insurance benefits, when adopted as the Commissioner's final determination following an administrative hearing, is subject to judicial review. 42 U.S.C. § 405(g). Section 405(g) provides the court with the power to: "[E]nter . . . a judgment affirming, modifying, or reversing the decision of the Commissioner . . . with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). "The findings of the Commissioner . . . as to any fact, if supported by substantial evidence, shall be conclusive . . . ." *Id.* The Commissioner's final determination not to award SSI benefits is subject to judicial review to the same extent. 42 U.S.C. § 1383(c)(3).

The court will "affirm the [ALJ's] decision if supported by substantial evidence on the record as a whole." *Anderson v. Astrue*, 696 F.3d 790, 793 (8th Cir. 2012). "Substantial evidence is 'less than a preponderance but . . . enough that a reasonable mind would find it adequate to support the conclusion.'" *Id.* (quoting *Jones v. Astrue*, 619 F.3d 963, 968 (8th Cir. 2010)); *see also Gonzales v. Barnhart*, 465 F.3d 890, 894 (8th Cir. 2006) ("Substantial evidence is less than a preponderance, but enough that a reasonable mind would find it adequate to support the ALJ's decision."). The court must consider, not only the evidence that supports the ALJ's decision, but also the evidence that detracts from it. *See Anderson v. Astrue*, 696 F.3d at 793; *Jones*, 619 F.3d at 968; *Gonzales*, 465

F.3d at 894; *Cox v. Astrue*, 495 F.3d 614, 617 (8th Cir. 2007) (stating that a court's review of an ALJ's decision "extends beyond examining the record to find substantial evidence in support of the ALJ's decision; [the court must] also consider evidence in the record that fairly detracts from that decision"). In making its decision, a court will not "reweigh" the evidence presented to the ALJ. *Gonzales*, 465 F.3d at 894 (quoting *Baldwin v. Barnhart*, 394 F.3d 549, 555 (8th Cir. 2003)); *Vester v. Barnhart*, 416 F.3d 886, 889 (8th Cir. 2005). Instead, it will "defer to the ALJ's determinations regarding the credibility of testimony, as long as those determinations are supported by good reasons and substantial evidence." *Gonzales*, 465 F.3d at 894.

In *Culbertson v. Shalala*, the Eighth Circuit Court of Appeals explained the standard as follows:

> This standard is something less than the weight of the evidence and it allows for the possibility of drawing two inconsistent conclusions, thus it embodies a zone of choice within which the [ALJ] may decide to grant or deny benefits without being subject to reversal on appeal.

30 F.3d 934, 939 (8th Cir. 1994) (quoting *Turley v. Sullivan*, 939 F.2d 524, 528 (8th Cir. 1991)) (quotation marks omitted). A court "will not disturb the denial of benefits so long as the ALJ's decision falls within the available 'zone of choice.'" *Casey v. Astrue*, 503 F.3d 687, 691 (8th Cir. 2007) (quoting *Nicola v. Astrue*, 480 F.3d 885, 886 (8th Cir. 2007)). "A decision is not outside that 'zone of choice' simply because [the court] may have reached a different conclusion had [the court] been the fact finder in the first instance." *Hacker v. Barnhart*, 459 F.3d 934, 936 (8th Cir. 2006); *see also Jones*, 619 F.3d at 968 ("We may not reverse the [ALJ] merely because we would have come to a different conclusion." (citation and quotation marks omitted)). Therefore, "even if inconsistent conclusions may be drawn from the evidence, the agency's decision will be upheld if it is supported by substantial evidence on the record as a whole." *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005); *see also Anderson v. Astrue*, 696 F.3d at

793 ("If, after reviewing the entire record, it is possible to draw two inconsistent positions, and the [ALJ] has adopted one of those positions, we must affirm."); *Clay v. Barnhart*, 417 F.3d 922, 928 (8th Cir. 2005) ("If there is substantial evidence to support the Commissioner's conclusion, we may not reverse even though there may also be substantial evidence to support the opposite conclusion.").

When a district court reviews an ALJ's decision, "[t]he grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based." *Mouwad v. Gonzales*, 485 F.3d 405, 413 (8th Cir. 2007) (quotation marks omitted) (quoting *SEC v. Chenery Corp.*, 318 U.S. 80, 87 (1943)). The grounds on which "the administrative agency acted [must be] clearly disclosed and adequately sustained." *Chenery Corp.*, 318 U.S. at 94. "'[A] reviewing court may not uphold an agency decision based on reasons not articulated by the agency,' when 'the agency [has] fail[ed] to make a necessary determination of fact or policy' upon which the court's alternative basis is premised." *Banks v. Massanari*, 258 F.3d 820, 824 (8th Cir. 2001) (alterations in original) (quoting *HealthEast Bethesda Lutheran Hosp. & Rehab. Ctr. v. Shalala*, 164 F.3d 415, 418 (8th Cir. 1998)). However, "a deficiency in opinion-writing is not a sufficient reason for setting aside an administrative finding where the deficiency had no practical effect on the outcome of the case," *Senne v. Apfel*, 198 F.3d 1065, 1067 (8th Cir. 1999), and "an ALJ's failure to adequately explain his factual findings is 'not a sufficient reason for setting aside an administrative finding' where the record supports the overall determination." *Scott ex rel. Scott v. Astrue*, 529 F.3d 818, 822 (8th Cir. 2008) (quoting *Senne*, 198 F.3d at 1067).

## B. *Review of Report and Recommendation*

The standard of review to be applied by the court to a report and recommendation of a magistrate judge is established by statute:

> A judge of the court shall make a de novo
> determination of those portions of the report or

> specified proposed findings or recommendations
> to which objection is made.  A judge of the court
> may accept, reject, or modify, in whole or in
> part, the findings or recommendations made by
> the magistrate judge.

28 U.S.C. § 636(b)(1); *see also* Fed. R. Civ. P. 72(b)(3) (providing that, when a party properly objects to a report and recommendation on a dispositive motion, a district court must determine de novo the magistrate judge's recommendation).  The Eighth Circuit has repeatedly held that it is reversible error for a district court to fail to conduct a de novo review of a magistrate judge's report and recommendation when such review is required. *See, e.g.*, *United States v. Lothridge*, 324 F.3d 599, 600 (8th Cir. 2003); *Hosna v. Groose*, 80 F.3d 298, 306 (8th Cir. 1996); *Hudson v. Gammon*, 46 F.3d 785, 786 (8th Cir. 1995); *Belk v. Purkett*, 15 F.3d 803, 815 (8th Cir. 1994).  The statute governing review provides only for de novo review of "those portions of the report or specified proposed findings or recommendations to which objection is made."  28 U.S.C. § 636(b)(1).  The court reviews the unobjected-to portions of the proposed findings or recommendations for "plain error."  *See United States v. Rodriguez*, 484 F.3d 1006, 1010-11 (8th Cir. 2007) (noting that, where a party does not file objections to a magistrate's report and recommendation, the party waives the right to de novo review and the court will review the decision for plain error).

## V.  ANALYSIS

### A.  The Five-Step Disability Analysis

Before reaching the substance of Gholston's Objections to Judge Scoles's Report and Recommendation, the court will briefly review the approach the ALJ used in arriving at his final determination that Gholston is not disabled.  When making a disability determination under either Title II or Title XVI, the ALJ is required to use a five-step sequential test as set out in the social security regulations.  *See* 20 C.F.R. §§ 404.1520(a)-(g), 416.920(a)-(g) (outlining the five-step test); *Andrews v. Colvin*, 791 F.3d 923, 928

9

(8th Cir. 2015); *Blackburn v. Colvin*, 761 F.3d 853, 857-58 (8th Cir. 2014); *Barnhart v. Thomas*, 540 U.S. 20, 24-25 (2003). The five-step framework requires the ALJ to determine: "1) whether the claimant is currently employed; 2) whether the claimant is severely impaired; 3) whether the impairment is, or is comparable to, a listed impairment [in 20 C.F.R. pt. 404, subpt. P, app. 1]; 4) whether the claimant can perform past relevant work; and if not, 5) whether the claimant can perform any other kind of work." *Andrews*, 791 F.3d at 928 (quoting *Hacker v. Barnhart*, 459 F.3d 934, 936 (8th Cir. 2006)). "If, at any point in this five-step process the claimant fails to meet the criteria, the claimant is determined not to be disabled and the process ends." *Id.* (citing *Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir. 2005)).

At step two of the test, an ALJ will consider an impairment to be severe if it "significantly limits [a claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c); *see also* 20 C.F.R. § 416.920(c); *Kirby v. Astrue*, 500 F.3d 705, 707 (8th Cir. 2007) ("An impairment is not severe if it amounts only to a slight abnormality . . . ."). Before moving from step three to step four of the process, the ALJ will determine the claimant's RFC. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The RFC is an assessment that is based upon the claimant's impairments and represents "the most [a claimant] can still do despite [his or her] limitations," and is determined "based on all the relevant evidence in [the] case record." 20 C.F.R. § 404.1545(a)(1); *see also* 20 C.F.R. § 416.945. An ALJ's RFC determination "must be supported by medical evidence that addresses the claimant's ability to function in the workplace." *Lewis v. Barnhart*, 353 F.3d 642, 646 (8th Cir. 2003); *see also Myers v. Colvin*, 721 F.3d 521, 527 (8th Cir. 2013) ("[A] claimant's RFC [must be] based on all of the relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of [his] limitations." (quotation marks omitted) (quoting *McKinney v. Apfel*, 228 F.3d 860, 863 (8th Cir. 2000))). If the claimant carries his or her

burden through the first four steps of the analysis, the burden shifts to the Commissioner at step five to prove that, considering the claimant's RFC, the claimant can "perform a significant number of . . . jobs in the national economy that are consistent with [his or] her impairments and vocational factors such as age, education, and work experience." *Phillips v. Astrue*, 671 F.3d 699, 702 (8th Cir. 2012) (quotation marks omitted) (quoting *Holley v. Massanari*, 253 F.3d 1088, 1093 (8th Cir. 2001)). Work exists in the national economy "when it exists in significant numbers either in the region where [the claimant] live[s] or in several other regions of the country," irrespective of whether "[w]ork exists in the immediate area in which [the claimant] live[s]," "[a] specific job vacancy exists" or if the claimant "would be hired if [he or she] applied for work." 20 C.F.R. § 404.1566(a); *see also* 20 C.F.R. § 416.966. "Isolated jobs that exist only in very limited numbers in relatively few locations outside of the region where [the claimant] live[s] are not considered 'work which exists in the national economy.'" 20 C.F.R. § 404.1566(b); *see also* 20 C.F.R. § 416.966.

An ALJ has an independent duty to fully and fairly develop the record in applying the five-step test. *See Cox*, 495 F.3d at 618; *Smith v. Barnhart*, 435 F.3d 926, 930 (8th Cir. 2006) (noting that the non-adversarial nature of administrative hearings makes it incumbent upon the ALJ to fully and fairly develop the record). "There is no bright line rule indicating when the Commissioner has or has not adequately developed the record; rather, such an assessment is made on a case-by-case basis." *Mouser v. Astrue*, 545 F.3d 634, 639 (8th Cir. 2008) (citation omitted). If the medical evidence on record is sufficient to make a disability determination, the ALJ need not order additional medical examinations to develop the record further. *See Kamann v. Colvin*, 721 F.3d 945, 950 (8th Cir. 2013) ("[A]n ALJ is permitted to issue a decision without obtaining additional medical evidence so long as other evidence in the record provides a sufficient basis for the ALJ's decision.") (quoting *Naber v. Shalala*, 22 F.3d 186, 189 (8th Cir. 1994)); *Barrett v. Shalala*, 38 F.3d

1019, 1023 (8th Cir. 1994) ("The ALJ is required to order medical examinations and tests only if the medical records presented to him do not give sufficient medical evidence to determine whether the claimant is disabled."). Having reviewed the five-step test, the court now turns to Gholston's Objections.

Gholston objects to several of Judge Scoles's individual findings and his ultimate conclusion that there was substantial evidence on the record as a whole to support the ALJ's decision to deny Gholston's applications for disability insurance benefits and SSI benefits. Specifically, Gholston first objects to Judge Scoles's finding that the ALJ adequately considered Gholston's obesity when making his RFC determination. He argues that the ALJ failed to develop the record on the work-related limitations of obesity. Second, he objects to Judge Scoles's finding that the record on Gholston's intelligence level was adequate and did not require further development. He also objects to Judge Scoles's finding that the ALJ's determination regarding Gholston's cognitive capacity is supported by substantial evidence. Third, Gholston objects to Judge Scoles's findings regarding the sufficiency of the medical evidence in the record to support the ALJ's RFC determination. Gholston further objects to Judge Scoles's finding that the ALJ did not fail to develop the record with additional consultative examinations. Finally, Gholston objects to Judge Scoles's findings regarding the ALJ's reliance on the VE to determine whether jobs that Gholston can perform exist in significant numbers in the national or regional economy at step five. The Commissioner raises no objections to the Report and Recommendation. The court has reviewed the unobjected-to portions of the Report and Recommendation and finds no plain error in their statements of fact or conclusions of law. Accordingly, the court adopts the unobjected-to portions of the Report and Recommendation and affirms it to that extent. At this point, the court will proceed to review the objected-to portions of the Report and Recommendation de novo.

## B. *Gholston's Obesity*

### 1. *Background*

In a 2009 Department of Corrections health screen, Gholston's height was recorded at 72 inches and his weight was recorded at 255 pounds, Administrative Record at 527, giving him a BMI of approximately 34.59. In the most recent examination on the record, Gholston's height was recorded at 71.75 inches, his weight was 279.8 pounds and his BMI was recorded at 38.32. *Id.* at 621. Under either set of measurements, Gholston is considered obese. *See id.* at 26 n.1 (noting that the National Health Institute's Clinical Guidelines categorize any BMI exceeding 30 as obese). While no consultative examinations were ordered to determine the specific effects of obesity on Gholston's functional capabilities, the examiners were apparently aware of his obesity when conducting their examinations and making their recommendations regarding Gholston's functional capacity. *See id.* at 559 (recording Gholston's height and weight); *id.* at 621 (noting that Gholston is obese).

### 2. *ALJ's decision*

The ALJ determined that Gholston's obesity is a severe impairment that "cause[s] more than slight abnormalities and [has] more than a minimal effect on [Gholston's] ability to do basic physical or mental work activities." *Id.* at 22. The ALJ further determined that Gholston's obesity does not meet or equal the severity of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. He offered the following explanation for his conclusion:

> Although obesity itself is not a listed impairment, I have considered the potential effects obesity has in causing or contributing to impairments in the musculoskeletal, respiratory, and cardiovascular system and that the combined effects of obesity with other impairments can be greater than the effects of each of the impairments considered separately.

*Id.* In determining Gholston's RFC, the ALJ calculated Gholston's BMI at 31.87, stating

that "[Gholston's] weight was documented in the medical records at 255 pounds at a height of 75"." *Id.* at 26. The ALJ cited to the 2009 Department of Corrections health screen for Gholston's measurements, but apparently misread his height to be 75 inches instead of 72 inches. The ALJ then explained that "[Gholston's] weight, including the impact on his ability to ambulate as well as his other body systems, has been considered within the functional limitations" found in determining Gholston's RFC. *Id.*

### 3. *Report and recommendation*

In the Report and Recommendation, Judge Scoles found that the ALJ addressed Gholston's obesity in a manner consistent with Social Security Ruling ("SSR") 02-1p when he determined that obesity is a medically determinable impairment and considered its effects on Gholston's other impairments, and therefore committed no error. Report and Recommendation at 16-17. Judge Scoles recognized that the ALJ incorrectly calculated Gholston's BMI when he used the incorrect height in making his calculation—had the ALJ used the correct height, Gholston's BMI would have been 34.59. *Id.* at 17. He also noted that, "had the ALJ used Gholston's weight in 2010, which was 279 pounds, his BMI would have been even higher"—specifically, it would have been 37.84. *Id.* However, Judge Scoles noted that Gholston is considered obese under any of these calculations. *Id.* Morever, Judge Scoles found that "Gholston points to no evidence in the record where any medical source, doctor or otherwise, placed work-related limitations on him due to his obesity." *Id.* at 17-18. Judge Scoles cited *McNamara v. Astrue*, 590 F.3d 607 (8th Cir. 2010)[4], and concluded that, without further evidence of work-related limitations due to

---

[4] In his Reply, Gholston argues that *McNamara* is inapposite because that case dealt with a determination of mental disability under Listing 12.05C, which requires a claimant to prove, *inter alia*, that he or she is suffering from an additional non-disabling impairment imposing an additional and significant work-related functional limitation. Reply at 2; *see also McNamara*, 590 F.3d at 610-11. In *McNamara*, the claimant was attempting to establish that obesity was her non-disabling impairment, but failed because she did not demonstrate that her obesity resulted in such work-related functional limitations. 590 F.3d

Gholston's obesity, the ALJ had sufficiently considered its impact in determining Gholston's RFC. *Id.* at 18.

### 4.    *Parties' arguments*[5]

In his Objections, Gholston argues that Judge Scoles incorrectly concluded that the ALJ properly considered Gholston's obesity in making his RFC determination even though the ALJ incorrectly calculated Gholston's BMI. He argues that, after recognizing the ALJ's miscalculation of Gholston's BMI, "[Judge Scoles] then claims to avoid or excuse the ALJ's error as not harmful, by blaming [Gholston] for not producing some expert medical opinion evidence to the effect that obesity causes or contributes to work-related limitations." Objections at 1. He claims that the ALJ failed to develop the record on the work-related limitations of obesity and that, had Disability Determination Services ("DDS") obtained consultative examinations "by qualified physicians, . . . then perhaps [Gholston] would have had expert medical opinion evidence to the effect that obesity causes or contributes to work-related limitations." *Id.* at 1-2. He argues that additional consultative examinations are required to determine the impact Gholston's obesity has on

---

at 611-12. Gholston does not renew this argument in the Objections. However, the court will consider the argument here. The court agrees that *McNamara* is not directly on point, and that the language in the case requiring proof of additional work-related functional limitations may come from the Eighth Circuit's interpretation of Listing 12.05C. However, *McNamara* cited *Forte v. Barnhart*, 377 F.3d 892 (8th Cir. 2004), with approval. 590 F.3d at 611-12. *Forte* involved a claim that the ALJ failed to consider the claimant's obesity in assessing his RFC. 377 F.3d at 896-97. The Eighth Circuit there applied the same standard as in *McNamara*—requiring some demonstration or allegation that the claimant's obesity contributed to an additional work-related functional limitation. *Id.* (citing *Anderson v. Barnhart*, 344 F.3d 808, 814 (8th Cir. 2003)). Accordingly, the court finds that, regardless of *McNamara*'s literal applicability to the instant action, the standard it espouses is a correct statement of the law as it relates to Gholston.

[5] The Commissioner has not filed a reply to Gholston's Objections. Because the Objections largely regard issues also raised on the initial appeal, the court will also consider the arguments raised by the Commissioner in Defendant's Brief.

his RFC and that Judge Scoles improperly "seems to be requiring [Gholston] to create evidence, [even though] the ALJ should have been the one to obtain that evidence." *Id.* at 2. Gholston argues that, as a result of this alleged failure to develop the record, there is "no acceptable medical source evidence" sufficient to support the ALJ's determination of Gholston's RFC and the impact of his obesity on it. *Id.* Gholston further claims that the ALJ's explanation of his conclusions regarding the impact of Gholston's obesity on his RFC was deficient for purposes of SSR 02-1p. *Id.*

In Defendant's Brief, the Commissioner argues that, even if the ALJ miscalculated Gholston's BMI, Gholston is still required to show that his obesity imposes "additional work-related limitations." Defendant's Brief at 9 (quoting *McNamara*, 590 F.3d at 612). The Commissioner argues that Gholston failed to make that showing: "Nothing in the record suggests that, but-for the ALJ's alleged miscalculation of [Gholston's] obesity, . . . he have limited [Gholston] to even more restrictive work." *Id.* According to the Commissioner, any additional work-related limitations would be mere speculation. *Id.* Thus, the Commissioner argues, Gholston has failed to show that the ALJ's miscalculation of Gholston's BMI is reversible error. *Id.*

### 5. *Application*

The court first notes that the ALJ did incorrectly calculate Gholston's BMI when he relied on a height of 75, rather than 72, inches to arrive at a BMI of 31.87. In reality, as noted above, the correct BMI calculation was actually 34.59. Based on Gholston's 2010 weight, his BMI was 37.84 and based on his 2012 weight, his BMI was 38.32. The court also notes that Gholston is considered obese whether he has a BMI of 31.87, 34.59, 37.84 or 38.32. Under the National Institute of Health's ("NIH") Clinical Guidelines, a BMI between 30 and 34.9 is classified as Level I obesity, a BMI between 35 and 39.9 is classified as Level II obesity and a BMI of 40 or higher is considered "extreme" or Level III obesity. SSR 02-1p, 67 Fed. Reg. 57,859-02, 57,860 (citing NIH Publication No. 98-

4083, September 1998). Thus, considering only the Department of Corrections report on which the ALJ relied in rendering his disability determination, Gholston only suffered from Level I obesity, regardless of whether the correct BMI of 34.59 or the erroneous BMI of 31.87 is used. Based on the 2010 and 2012 BMI calculations, Gholston suffers from Level II obesity. Because Gholston is required to establish disability on or before December 31, 2011, Administrative Record at 19, the court finds that the most recent BMI calculation before that date, here 37.84 based on Gholston's 2010 weight, is the appropriate BMI to consider. Thus, during the relevant time period, the court finds that Gholston was suffering from Level II obesity, rather than Level I as the ALJ determined.

However, SSR 02-1p explains that "[t]hese levels describe the extent of obesity, but they do not correlate with any specific degree of functional loss." *Id.* at 57,860. Furthermore, Level III obesity, which Gholston does not have, is said only to "represent[] the greatest *risk* for developing obesity-related impairments." *Id.* (emphasis added). Therefore, merely determining that Gholston's obesity was at a higher clinical guideline level than the ALJ believed is not alone reason for the court to reject the ALJ's findings. As SSR 02-1p points out, the levels themselves are not correlative with functional loss, and even the highest level of obesity presents only the most heightened risk of functional limitations. In other words, Gholston's Level II obesity does not necessarily require a finding that he suffers from functional limitations due to his obesity. The court finds that the mere fact that the ALJ miscalculated Gholston's BMI and his obesity Level is not reversible error. Instead, the relevant consideration is whether the ALJ properly considered whether Gholston's obesity contributes to or results in additional work-related limitations. *Cf. McNamara*, 590 F.3d at 612; *see also Forte*, 377 F.3d at 896-97; *Anderson v. Barnhart*, 344 F.3d at 814 (holding that a claimant waived his argument that his obesity should be considered an impairment because he never alleged functional limitations stemming from his obesity in his application for benefits or during his hearing).

Here, the record is replete with evidence regarding Gholston's impairments. *See, e.g.*, Administrative Record at 46-75, 83, 85, 92-109, 112-133, 290-93, 309-22, 337-45, 357-73, 390-93, 419-31, 467, 473-504, 516, 525-39, 552, 556-69, 615-21, 625-36; *see also* 20 C.F.R. § 404.1512 (describing sources of medical evidence used in making a disability determination). None of the evidence on record indicates that Gholston's obesity results in work-related functional limitations. As noted above, the examiners were aware of Gholston's obesity, and accordingly took it into consideration in rendering their opinions and reports on his functional capacity. *See, e.g.*, *id.* at 98, 107, 119, 130 (citing "obesity" as a medically determinable impairment considered in rendering Gholston's RFC in Disability Determination Evaluations). Additionally, Gholston did not raise the issue at the administrative hearing. His testimony at the hearing focused primarily on his shoulder and leg injuries, as well as his mental impairments. *See id.* at 59, 65-69.

*Forte v. Barnhart* is instructive in this case. 377 F.3d 892. In *Forte*, the ALJ failed to explicitly consider the claimant's obesity in rendering his RFC. *Id.* at 896. The Eighth Circuit found no error, however, because, while the claimant's treating doctors noted his obesity and urged him to lose weight, "none of them suggested his obesity imposed any additional work-related limitations, and [the claimant] did not testify that his obesity imposed additional restrictions. Indeed, [one of the doctors] repeatedly reported that [the claimant] was obese, but nonetheless believed that he could perform light work." *Id.* (citation omitted). Here, as in *Forte*, Gholston's records indicate that the medical personnel evaluating him were aware of his obesity but did not impose additional functional limitations on him; nor did Gholston testify that his obesity caused him additional functional limitations at his hearing. In short, the record does not indicate that Gholston's obesity results in any additional work-related limitations. In fact, the record supports a finding that the RFCs and evidence that the ALJ relied on in rendering his final RFC determination all adequately took Gholston's obesity into account. Based on the

foregoing, the court finds that the ALJ adequately considered Gholston's obesity. *See Forte*, 377 F.3d at 896. Accordingly, insofar as Gholston's obesity impacted the ALJ's RFC determination, the court finds that such determination is supported by substantial evidence on the record.

Additionally, the court finds that the ALJ's consideration of Gholston's obesity is adequate. SSR 02-1p requires the agency to "explain how [it] reached [its] conclusions on whether obesity caused any physical or mental limitations." 67 Fed. Reg. at 57,863. In his decision, the ALJ determined that Gholston's obesity is a severe impairment, but found that it did not meet or equal the severity of a listed impairment. Administrative Record at 22. In reaching this conclusion, the ALJ explained that he "considered the potential effects obesity has in causing or contributing to impairments in the musculoskeletal, respiratory, and cardiovascular system and that the combined effects of obesity with other impairments can be greater than the effects of each of the impairments considered separately." *Id.* In addition, the ALJ stated that he considered "[Gholston's] weight, including the impact on his ability to ambulate as well as his other body systems." *Id.* at 26. Gholston objects to these findings, claiming that "the ALJ here only paid lip service" to the explanation required by SSR 02-1p. Objections at 2. According to Gholston, the ALJ's failure to make more specific findings regarding his obesity's impact on his physical or mental limitations robs him of his "promised explanation" and prevents him from obtaining an "explanation for the conclusion" drawn by the ALJ and insight into "what the actual conclusion is." *Id.*

The court agrees that the language the ALJ used when considering Gholston's obesity and its impact on his functional capacity, in large part, merely parrots the language found in SSR 02-1p. *Compare, e.g.*, Administrative Record at 22 *with* SSR 02-1p, 67 Fed. Reg. at 57,860. However, this alone does not dictate that the court must reverse the ALJ's decision. "[A]n arguable deficiency in opinion-writing technique is not a sufficient

reason for setting aside an administrative finding where . . . the deficiency probably had no practical effect on the outcome of the case." *Forte*, 377 F.3d at 896 (quoting *Brown v. Chater*, 87 F.3d 963, 966 (8th Cir. 1996)) (brackets and quotation marks omitted); *see also Owen v. Astrue*, 551 F.3d 792, 801 (8th Cir. 2008). Because the court finds that the ALJ's consideration of Gholston's obesity is supported by substantial evidence on the record, the mere fact that the ALJ did not engage in an exhaustive discussion regarding how Gholston's obesity impacted the ALJ's functional capacity analysis does not require the court to reverse. The ALJ's ultimate conclusions are supported by the record and any deficiency in his discussions of SSR 02-1p almost certainly had no practical effect on the outcome of the case. Accordingly, the court affirms the ALJ's RFC determination insofar as it pertains to Gholston's obesity.

### C. Gholston's Intelligence Level

#### 1. Background

Gholston completed tenth grade and part of eleventh grade before dropping out of school. Administrative Record at 66. He has not completed his GED. *Id.* He states that he was enrolled in "special education" classes for two subjects: English and mathematics. *Id.* at 67. Gholston was absent from school 27 times in ninth grade, 37 times in tenth grade and 29 times in the first semester of eleventh grade before dropping out of school. *Id.* at 458. The record also reveals that he received three "F" grades in ninth grade, six "F" grades in tenth grade and four "F" grades in the first semester of eleventh grade. *Id.* At the administrative hearing, Gholston testified that he can "barely" read and write, "somewhat" knows how to use a computer and would only be able to make change for a five dollar bill after writing it down. *Id.* at 66-67. Gholston also indicated that, prior to being placed in special education classes, he was evaluated in school and supposed he must have scored poorly in English and mathematics due to his placement in those special education classes after testing. *Id.* at 67.

## 2.     *ALJ's decision*

With respect to Gholston's intellectual functioning, the ALJ stated the following when discussing his final RFC determination:

> [Gholston's] [r]epresentative argued that [Gholston] had cognitive limitations; however [Gholston's] treaters at Blackhawk-Grundy Mental Health make [no] mention of such limitations and [Gholston's] school records reveal poor grades due to repeated absences rather than cognitive limitations. There is no indication that a[n] [Individualized Education Program] was believed necessary and [Gholston] attended [r]egular rather than special [e]ducation classes.

Administrative Record at 29. In addition, the ALJ noted that "the majority of the mental status evaluations support that [Gholston] was generally oriented, alert, pleasant, cooperative, and in no acute distress. [Gholston] displayed normal speech, appropriate eye contact, stable mood, intact memory, fair insight and judgment, and neutral affect." *Id.* at 26-27 (citations omitted). The ALJ also discussed Gholston's "global assessment functioning" ("GAF") scores. *Id.* at 28. Gholston's GAF scores demonstrate that he had "serious symptoms or serious difficulties functioning." *Id.* at 28 n.2. However, because Gholston's GAF scores "are inconsistent with the treatment notes from that same period" and because of Gholston's "admitted daily activities of babysitting his children, going out alone, shopping, driving, and managing his own finances," the ALJ gave the GAF scores little weight. *Id.* at 28. He found that Gholston's admitted daily activities were simply "not consistent with someone with a debilitating mental impairment." *Id.* at 28-29. The ALJ also noted that Gholston "testified he would also have his sons over to visit, care for his pit bulls, and, occasionally, attend church. Some the physical and mental abilities and social interactions required in order to perform these activities are the same as those necessary for obtaining and maintaining employment." *Id.* at 25. Thus, the ALJ concluded that Gholston's intellectual functioning provided little or no work-related limitations. Instead, Gholston's "ability to participate in [various daily] activities

undermined the credibility of [his] allegations of disabling functional limitations." *Id.*

At the beginning of the administrative hearing, Gholston requested the ALJ order an additional consultative examination "to work up . . . Gholston's depression, anxiety [and] intellectual abilities." *Id.* at 44. The ALJ took Gholston's request under consideration but delayed ruling on the request until the end of the hearing. *Id.* At the end of the hearing, the ALJ raised the issue of Gholston's evaluations at Blackhawk-Grundy Mental Health Center ("Blackhawk-Grundy") and asked Gholston whether the therapists there had prepared any sort of report detailing the extent of Gholston's intellectual capabilities. *Id.* at 79. Gholston responded that they had not, and that they would not do so as a matter of general policy. *Id.* The ALJ then indicated that he would take Gholston's request for an additional consultative examination under advisement. *Id.* The ALJ did not ultimately order a consultative examination, and instead simply rendered his final disability determination, finding that Gholston did not suffer from a debilitating intellectual impairment.

### 3. *Report and recommendation*

Judge Scoles found that the ALJ committed no error in his consideration of Gholston's intellectual functioning. Specifically, Judge Scoles refers to the ALJ's finding that "[Gholston's] treaters at Blackhawk-Grundy Mental Health make no mention of [cognitive] limitations and [Gholston's] school records reveal poor grades due to repeated absences rather than cognitive limitations." Report and Recommendation at 18 (quoting Administrative Record at 29). Thus, Judge Scoles found that, "even if inconsistent conclusions could be drawn on this issue, . . . [the ALJ's conclusions] are supported by substantial evidence on the record as a whole." *Id.*

### 4. *Parties' arguments*

Gholston contends that Judge Scoles "glossed over" the ALJ's failure to develop the record on Gholston's intelligence level. Objections at 2. Reliance on the Blackhawk-

Grundy screening, according to Gholston, is inappropriate because "[a] mental health clinic's clinical interviews or therapeutic sessions, including original intake, do not normally test for intelligence," nor does standard psychological testing. *Id.* at 3. Instead, "[s]tandardized intelligence test results are essential to the adjudication of all cases of intellectual disability." *Id.* (quoting 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00D.6.b). Gholston also takes issue with the ALJ's determination that Gholston's poor grades in high school were a result of "repeated absences rather than cognitive limitations." Objections at 3 (quoting Administrative Record at 29). Gholston contends that he "had been placed in special education presumably for a learning disorder, but surely not for attendance" and that "[t]here is no evidence of any causal connection between [Gholston's] attendance and [his] grades in school." *Id.* He criticizes the ALJ for failing to "explain any reasoning, and [for] merely speculating" as to his conclusion regarding Gholston's performance in school. *Id.* In short, Gholston argues that, because the ALJ failed to obtain standardized intelligence test results to determine Gholston's intelligence level, the record is insufficient regarding Gholston's intelligence and therefore the ALJ's findings are not supported by substantial evidence. *See id.* at 4.

The Commissioner argues that the ALJ's consideration of Gholston's intelligence level is supported by substantial evidence and reminds the court that it cannot "reweigh the evidence" considered by the ALJ. Defendant's Brief at 9. The Commissioner reiterates that the ALJ found Gholston did not suffer from a mental impairment because, at least in part, his poor grades were attributable to frequent absences, rather than a cognitive impairment. *Id.* at 9-10. According to the Commissioner, even if Gholston's intellectual abilities are actually deficient in some way, because they stemmed from absences rather than a medically determinable impairment, the ALJ need not have considered Gholston's cognitive functioning in rendering an RFC determination. *Id.* at 10. In fact, the Commissioner argues, for the ALJ to have considered Gholston's intellectual limitations

in the RFC would have been erroneous, since any such limitations did not stem from a medically determinable impairment. *Id.* The Commissioner further argued that, because Gholston received specialized mental health treatment for various mental disorders at Blackhawk-Grundy, and because no provider there diagnosed any cognitive impairment, "it [is] implausible that a diagnosis slipped through the cracks." *Id.* The Commissioner also observed that Gholston was able to complete some of his own paperwork relating to his case and that this undermines his assertions of cognitive impairment. *Id.* Because the ALJ's inferences were reasonable, the Commissioner concludes, the court must affirm. *Id.*

### 5.    *Application*

To support his contention that he has cognitive limitations, Gholston points to his poor grades in high school, his enrollment in "special education" English and mathematics classes and his own testimony. Objections at 3. Gholston argues that the record does not explicitly demonstrate a causal link between his absenteeism in high school and poor academic performance. *See* Administrative Record at 458-59. The court agrees. However, Gholston did not testify as to the causes of his failing grades or absenteeism at the administrative hearing. *Id.* at 66-67. He suggests in his Objections that "[t]he existence of excess absences does not automatically prove that is what caused poor grades, and in fact, it is even more likely that the cause of the poor grades is also the cause of the excess absences." Objections at 3. As the court has already noted, Gholston faults the ALJ for "merely speculating" as to the causes of Gholston's failing grades. *Id.* But what Gholston himself does not do is provide additional objective evidence to suggest that the cause of his poor academic performance is indeed a mental impairment rather than absenteeism. He merely points out that he was placed in special education classes as evidence that he was suffering from a learning disorder, but "surely not [due to] attendance." *Id.* But in condemning the ALJ for speculating as to the cause of Gholston's

poor performance and placement in special education, Gholston himself invites the court to engage in that selfsame speculation, merely arriving at a different conclusion than the ALJ. This the court is forbidden to do. "If, after reviewing the entire record, it is possible to draw two inconsistent positions, and the [ALJ] has adopted one of those positions, [the court] must affirm." *Anderson v. Astrue*, 696 F.3d at 793; *see also Clay*, 417 F.3d at 928 (holding that, so long as the agency's ultimate conclusion is supported by substantial evidence, the court may not reverse even if substantial evidence exists supporting the opposite conclusion).

Here, there is no evidence other than Gholston's school records themselves that speak to the reason for his poor performance in school. While it is true that Gholston's placement in special education classes can be read to suggest that his failing grades were due to intellectual shortcomings, the court finds that the evidence on the record can also support the conclusion that Gholston's poor academic performance is due to excessive absenteeism. It is reasonable to presume that Gholston's inability to perform in English and mathematics is due to his absence from class. Excessive absences alone may be a sufficient reason to fail a student. Furthermore, when a student misses class, he or she generally fails to learn the materials presented in that class. It is reasonable to believe that poor performance on an evaluation to qualify for special education classes can be due to gaps in knowledge from missing class rather than a mental impairment. In light of these observations, substantial evidence supports the ALJ's determination. *See Anderson v. Astrue*, 696 F.3d at 793 (describing the standard as less than a preponderance of the evidence, and instead as "enough that a reasonable mind would find it adequate to support the conclusion"). Because the court finds that both conclusions were permissible to draw, the court is bound to affirm the ALJ's finding that Gholston's poor academic record is due to excessive absenteeism rather than a mental impairment. Insofar as the ALJ's disability determination is based on this finding, the court affirms.

Gholston further argues that the ALJ erred in not ordering a further consultative examination to determine the extent of his mental impairments. Though it is less than clear based on his filings, Gholston does not appear to allege that the ALJ should have found that he qualified as disabled at step three of the five-step test by meeting one of the listed impairments of 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.05. *See, e.g.*, Plaintiff's Brief at 14 (describing the issue as one of "intellectual functioning" potentially impacting he ALJ's RFC and arguing that the hypothetical posed to the VE incorrectly described Gholston's limitations); Reply at 2 (describing the issue as "cognitive functioning"); Objections at 2-3 (describing the issue as "cognitive functional capacity" and requesting standardized intelligence testing); Administrative Record at 44 (requesting an additional examination to consider Gholston's "intellectual abilities"). Instead, it appears that Gholston is arguing that considerations of his mental limitations should have impacted the ALJ's RFC determination. In order to properly consider those limitations, according to Gholston, additional evidence is needed—*i.e.*, the ALJ should have ordered an additional consultative examination to develop the record regarding his intellectual capabilities. However, where the evidence on record is sufficient to make a disability determination, the ALJ need not order additional tests. *See Kamann*, 721 F.3d at 950; *Halverson v. Astrue*, 600 F.3d 922, 933 (8th Cir. 2010). Here, the evidence on record included Gholston's testimony, his function reports, medical records and the psychological examination conducted at Blackhawk-Grundy. The evidence on the record generally supports the ALJ's findings.

Gholston is correct in that "[s]tandardized intelligence test results are essential to the adjudication of all cases of *intellectual disability* that are not covered under the provisions of 12.05A." Objections at 3 (emphasis added) (quoting 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00D.6.b). However, as noted above, Gholston does not suggest that he suffers from a listed intellectual disability, but rather that he has an intellectual

impairment that should have been considered in his RFC or at step five of the five-part test. Section 12.00D.6.b does not demand standardized intelligence tests simply because a claimant has argued that he or she suffers from a generic sort of mental impairment. The term "intellectual disability" as used in § 12.00D.6.b specifically refers to listing 12.05. Listing 12.05 bears the heading "Intellectual disability" and provides the specifications for a finding of presumptive disability at step three of the five-part test. In other words, the use of the term "intellectual disability" in § 12.00D.6.b means, very specifically, an intellectual disability sufficiently severe to render a claimant presumptively disabled at step three. It is only in those limited circumstances that the results of a standardized intelligence test will be "essential" to an adjudication of that case. This conclusion is supported by the analyses required under listings 12.05B-12.05D. Under each of those listings, the agency must initially consider the claimant's "valid verbal, performance, or full scale IQ." *See* 20 C.F.R. pt. 404, subpt. P, app. 1, §§ 12.05B-12.05D. Clearly, standardized intelligence testing is essential to those determinations because the results for such testing form the basis for the agency's adjudication of whether the claimant has proven that he or she suffers from a listed impairment. This is not so where the claimant's allegation is that he or she has a non-listed mental impairment.

In *Lott v. Colvin*, the Eighth Circuit considered a claimant's alleged disability under listing 12.05C and found that, in that case, the ALJ's failure to order an IQ test was reversible error. 772 F.3d 546 (8th Cir. 2014). The Eighth Circuit recognized that the claimant Lott's intellectual disability claim arose at step three of the five-step process and that the claimant alleged he suffered from a listed impairment. *Id.* at 549. Lott was diagnosed as suffering from "mild mental retardation" by a clinical psychologist but without the benefit of an IQ test. *Id.* at 547. The ALJ found that Lott suffered from several severe impairments at step two, including mild mental retardation based upon the clinical psychologist's diagnosis, but did not order an IQ test. *Id.* at 548. The ALJ

ultimately found that Lott did not meet the requirements of listing 12.05C and subsequently determined Lott was not disabled. *Id.* The Eighth Circuit held that, given the ALJ's adoption of the clinical psychologist's mild mental retardation diagnosis, the failure to order an IQ test to determine whether Lott met listing 12.05C at step three was reversible error. *Id.* at 552. The Eighth Circuit reiterated that the results of an IQ test were essential to determine whether Lott met listing 12.05C. *Id.* at 551-52.

The Eighth Circuit also found that the ALJ's adoption of the mild mental retardation diagnosis was incongruous with his finding that Lott did not display any "significantly sub-average general intellectual functioning with deficits in adaptive functioning." *Id.* at 551. The severity of Lott's mental impairments was insufficient, found the ALJ, because Lott was able to "work[] successfully much of his adult life in mainstream jobs." *Id.* According to the Eighth Circuit, if it were to accept the ALJ's reasoning, it would be "practically impossible for noninstitutionalized mentally-retarded claimants to meet listing 12.05C because ALJs will nearly always be able to point to the performance of rudimentary activities of daily living—even though such activities do not, in fact, show that a person is not mentally retarded." *Id.* Instead, "it may be reversible error for an ALJ not to order a consultative examination when, without such an examination, he cannot make an informed choice." *Conley v. Bowen*, 781 F.2d 143, 146 (8th Cir. 1986) (per curiam), *accord Lott*, 772 F.3d at 549. Where the ALJ finds that the claimant suffers from a severe mental impairment at step two of the five-part test, and the claimant seeks an adjudication of presumptive intellectual disability at step three, failure to order an "essential" IQ test signals that the ALJ cannot make an informed choice. In such a case, the proper remedy is for the court to remand the case to the agency for additional testing and a new hearing by an ALJ.[6] *See Lott*, 772 F.3d at 552 (citing *Snead v. Barnhart*, 360

---

[6] The court notes that, though the Eighth Circuit in *Lott* recognized that the ALJ is not *required* to find a claimant is intellectually disabled merely because his or her IQ falls

F.3d 834, 839 (8th Cir. 2004)); *Boyd v. Sullivan*, 960 F.2d 733, 736 (8th Cir. 1992)).

However, the court finds *Lott* to be readily distinguishable and finds that it does not necessarily require remand to the agency for further testing. *Lott* specifically dealt with a claim of presumptive disability under listing 12.05C, which the Eighth Circuit noted several times. As noted above, an IQ score is generally essential to a determination of impairment under that listing. Here, Gholston does not argue that he suffers from a listed impairment, which makes the instant action unlike *Lott* in a significant manner. Because the command to consider standardized intellectual testing results extends only to listed impairments, Gholston cannot invoke it to demand the court remand his case for further testing where he does not allege he suffers from a listed impairment. Furthermore, the ALJ in *Lott* specifically found that Lott's mild mental retardation was a severe impairment at step two of the five-part test in adopting the clinical psychologist's diagnosis. The Eighth Circuit noted that fact in the disposition of the case. *See Lott*, 772 F.3d at 552. Here, the ALJ made no determination that Gholston suffered from a severe impairment relating to his intellectual functioning at step two. Administrative Record at 22 (finding that Gholston suffers from affective and anxiety disorder, but not from an intellectual impairment). Thus, the duty to develop the record, while still present, is not as heightened

---

within the range specified in listing 12.05, it still found the appropriate remedy was remand for additional testing. *See* 772 F.3d at 552 n.5 (citing *Clark v. Apfel*, 141 F.3d 1253, 1255 (8th Cir. 1998) ("The [ALJ] is not required to accept a claimant's I.Q. scores, however, and may reject scores that are inconsistent with the record.") (alteration in original); *Miles v. Barnhart*, 374 F.3d 649, 699 (8th Cir. 2004) ("'Indeed, test results of this sort should be examined to assure consistency with daily activities and behavior.'") (quoting *Clark*, 141 F.3d at 1255)). Thus, while the court recognizes that, even if IQ scores are not dispositive of the issues surrounding Gholston's intellectual capacity per se, the ALJ's duty to develop the record is a duty independent from the mere fact that an ALJ is free to depart from the IQ scores where evidence suggests it may be appropriate to do so. Accordingly, the fact that Gholston's IQ test results might ultimately be ignored would be no reason, in and of itself, to deny his request for additional testing.

as it was in *Lott* and does not require the court to order additional testing as a matter of course. Instead, so long as the ALJ's determinations that Gholston's intellectual capabilities did not result in work-related limitations is supported by substantial evidence on the record as a whole, the court will affirm.

In this case, the medical and psychological evidence on the record does not specifically indicate that Gholston has any cognitive limitations. Instead, the record reveals that, as the ALJ found in his decision, Gholston is capable of performing daily activities such as paying his bills, counting change, handling a savings account, using a checkbook, following written and spoken instructions, reading written reminders, driving, shopping, caring for his girlfriend's children and preparing some meals. *See* Administrative Record at 25, 364-70. The court is mindful of the Eighth Circuit's observation in *Lott* that "ALJs will nearly always be able to point to the performance of rudimentary activities of daily living" but that such activities "do not, in fact, show that a person is not mentally [impaired]." 772 F.3d at 551. However, in the instant action, the ALJ specifically noted that "[s]ome of the . . . mental abilities . . . required in order to perform the[] activities [listed above] are the same as those necessary for obtaining and maintaining employment." Administrative Record at 25. "[Gholston's] ability to participate in such activities undermine[s] the credibility of [Gholston's] allegations of disabling functional limitations." *Id.* Thus, while merely reciting a list of daily activities performed by the claimant and then concluding that a claimant is not disabled may be inappropriate, here the ALJ went beyond that. He specifically found that the types of activities that Gholston can perform correlate with his ability to function in a work environment, and in doing so found that Gholston's alleged intellectual impairment did not result in work-related functional limitations. In this case, the ALJ appropriately considered Gholston's functional abilities in determining that he is not disabled.

The ALJ's findings are further supported by Gholston's mental health evaluation

from Blackhawk-Grundy. The staff at Blackhawk-Grundy noted that Gholston was talkative, had an appropriate affect, both his long and short term memory were intact, his judgment and insight were fair, his thought processes were organized and his appearance was "[p]leasant, [with] good eye contact," but that his concentration was impaired. *Id.* at 632. Nowhere does the evaluation mention intellectual capability, as Gholston indicates in his Objections and as the ALJ recognized at the administrative hearing. However, the staff at Blackhawk-Grundy conducted an exhaustive examination of Gholston, documenting everything from his energy levels to his current medical conditions to his family history. *Id.* at 631-36. It is reasonable to believe that, had the staff from Blackhawk-Grundy noted anything related to Gholston's intellectual functioning, they would have included it in the report. As such, the ALJ's reliance on the Blackhawk-Grundy report in determining whether Gholston suffered from intellectual impairments is reasonable and supported by substantial evidence on the record. Because the ALJ's determination that Gholston's intellectual capabilities do not contribute to Gholston's functional limitations is supported by substantial evidence on the record as a whole, to the extent that the ALJ's RFC determination relies on this finding, the court affirms.

### D. Consultative Examinations and Medical Opinion Sources

### 1. Background

As the court has previously noted, the record is filled with evidence regarding Gholston's impairments. *See, e.g.*, Administrative Record at 46-75, 83, 85, 92-109, 112-133, 290-93, 309-22, 337-45, 357-73, 390-93, 419-31, 467, 473-504, 516, 525-39, 552, 556-69, 615-21, 625-36. However, because certain sources of medical evidence are at issue, the court will discuss them in further detail here. On October 29, 2010, Sara Douglas performed a consultative examination on Gholston at the request of DDS (the "Douglas Examination"). Administrative Record at 554-61. Douglas is an Advanced Registered Nurse Practitioner ("ARNP"). *Id.* at 560. After completing the requested

examination, Douglas opined that:

> [Gholston] is able to lift ten pounds frequently. He can stand for only five minutes, walk about two blocks and sit for a half hour before developing severe pain. He has no limitations with speaking or hearing. He does have limitations handling objects due to his left shoulder pain and the potential to drop things. He is unable to stoop, kneel or crawl. He is also unable to work in environments with dust, fumes or temperature hazards due to his shortness of breath problems.

*Id.* In addition, Douglas observed that Gholston is "pleasant" and "in no distress" and that his "[s]trength is full and equal throughout the upper and lower extremities." *Id.* She also stated that Gholston's left foot deviates due to hardware placed in his ankle after a childhood injury, he has pain in his right calf and shoulder, "[h]e has shortness of breath with asthma and potentially COPD" and he "has some symptoms of depression." *Id.*

On February 3, 2012, DDS ordered a consultative examination to be performed at Cedarloo Family Practice (the "Dr. Christiason Examination"). *Id.* at 614. At the examination, Gholston's vital signs were recorded by Amanda Akkerman, a Registered Nurse, and signed by her at 9:55 a.m. *Id.* at 621. Dr. Kyle Christiason signed the report later at 6:02 p.m. *Id.* Gholston's chief complaints at this exam were left ankle pain and right calf pain. *Id.* at 620. Dr. Christiason stated that Gholston was "well appearing, [with] no acute distress" and his lungs were "without crackles, ronchi or wheezes." *Id.* at 621. Dr. Christiason assessed Gholston with limb pain and intermittent asthma, and stated the following under the heading of "Plan/Discussion":

> [Gholston] reports ability to stand no more than one hour before he needs to sit due to leg pain bilaterally. He reports prolonged sitting causes stiffness. He reports difficulty using his hands, especially in colder weather. For example, one of his hobbies is working on cars, but indicates "I came [sic] use a wrench." He reports poor vision in the left eye, but other details unknown. No problems with hearing. Estimated ability to walk less than one block per patient. Cold weather

aggravates pain diffusely including left arm, both legs.

*Id.* In addition, the examination included a range of motion worksheet in which Gholston is recorded to have largely normal range of motion, left ankle pronation, an unassisted gait and sufficient upper and lower extremity muscle strength and grip strength with good effort. *Id.* at 616-17.

### 2. *ALJ's decision*

In determining Gholston's RFC, the ALJ gave the Douglas Examination "less than significant weight" because "a nurse practitioner is not an acceptable medical source entitled to be given the same weight as a qualifying medical source opinion." *Id.* at 27 (citations omitted). Nevertheless, he found that Douglas' examination is entitled "some" weight, finding that it is "generally supported by the evidence of record and [Gholston's] reported activities of daily living." *Id.* With respect to the Dr. Christiason Examination, the ALJ gave it "little weight." *Id.* at 28. He explained:

> I find Dr. Christiason's assessment of [Gholston's] functional limitations is inconsistent with the evidence of record. It appears Dr. Christiason relied primarily on [Gholston's] subjective complaints that have been found only partially credible. Furthermore, Dr. Christiason's determinations are inconsistent with the findings from his own evaluation of [Gholston]. . . . The only positive findings were limited to the presence of surgical scars on the left ankle, a BB sized nodule appreciated within the skin of the right calf, and his left ankle pronated with pes planus. Furthermore, the overly restrictive limitations opined by Dr. Christiason are inconsistent with [Gholston's] own admission regarding his activities of daily living.

*Id.*

In contrast to the Douglas and Dr. Christiason Examinations, when determining Gholston's RFC, the ALJ gave "great weight" to various office treatment records obtained from Allen Occupational Health and the Department of Corrections. *Id.* at 27. The ALJ

determined that "[t]hese opinions are well supported by the evidence of record." *Id.* The ALJ gave little weight to the opinions of various state agency review physicians that determined that Gholston could "perform a range of work at the light exceptional level" because their opinions, while supported by the medical evidence available at the time of review, were contradicted by Gholston's subjective complaints of pain. *Id.* at 28. Similarly, the ALJ gave little weight to a state agency review physician who found that Gholston suffered from no mental health impairments. *Id.* He found that the state agency review physician had insufficient evidence to make an informed determination, and that a full review of the record revealed the severe mental impairments the ALJ found at step two. *Id.* The ALJ also considered Gholston's subjective complaints of pain, as well as a report furnished by Gholston's friend Gary Alexander. *Id.* at 24-25, 29. The ALJ ultimately found that, while Gholston certainly suffered from medically determinable impairments, "[Gholston's] statements concerning the intensity, persistence, and limiting effects of these symptoms are not credible to the extent those statements are inconsistent with the residual functional capacity assessed [in the decision]." *Id.* at 25. He similarly found that "Mr. Alexander's opinion regarding [Gholston's] disability is not an unbiased one because he has a personal motivation to support [Gholston]. Most importantly, the clinical or diagnostic medical evidence that is discussed elsewhere in [the ALJ's] decision does not support his statements concerning [Gholson's] allegations of disability." *Id.* at 29. Accordingly, the ALJ gave Alexander's opinion little weight. *Id.*

### 3. *Report and recommendation*

In his Report and Recommendation, Judge Scoles found that "the ALJ thoroughly reviewed and considered Gholston's entire medical history and treatment in making his RFC determination" and that "the ALJ properly considered Douglas' opinions in accordance with SSR 06-03p." Report and Recommendation at 19, 20. Judge Scoles observed, as did the ALJ, that Douglas is not an acceptable medical source. *Id.* at 19.

However, he also observed that examinations from sources not classified as acceptable medical sources, or "other medical sources," must also be taken into account in an administrative hearing to determine a claimant's disability. *Id.* Thus, Judge Scoles concluded, the ALJ did not improperly consider Douglas' examination when he gave it "less than significant weight." *Id.* at 20.

Judge Scoles found that the ALJ properly developed the record and that "Gholston offers no authority for the proposition that a consultative examiner must be an acceptable medical source." *Id.* at 21. Gholston argued that the Douglas Examination was inappropriate to rely on because Douglas is not an acceptable medical source as defined by the Code of Federal Regulations. However, Judge Scoles concluded that only those consultative examinations specifically ordered to determine whether a claimant suffers from a medically determinable impairment need be performed by an acceptable medical source. *Id.* at 21-22. Because Douglas conducted only a generic disability examination, it was not essential that she be an acceptable medical source, even though she was a consultative examiner. *Id.* at 22. Thus, the ALJ did not err in giving her opinion "some" weight. *Id.*

Finally, Judge Scoles determined that the Dr. Christiason Examination was authored by an acceptable medical source. *Id.* at 21. "[A]t no place on the document does it state that [nurse] Akkerman dictated or recorded the report." *Id.* Instead, the record revealed that Akkerman merely recorded Gholston's vital signs. *Id.* According to Judge Scoles, Dr. Christiason's electronic signature indicated that "Dr. Christiason fully participated in the consultative examination of Gholston." *Id.* Accordingly, Judge Scoles concluded that "the ALJ fulfilled his duty to fully and fairly develop the record with regard to consultative examinations in this case." *Id.* at 22.

### 4. *Parties' arguments*

Gholston objects to Judge Scoles' finding that the ALJ adequately weighed the

Douglas Examination and that the ALJ properly developed the record in this case by relying on the Dr. Christiason Examination.[7]  With respect to the Douglas Examination, Gholston argues that, because Douglas is an ARNP rather than a doctor, "Douglas is not an acceptable source to provide evidence of diagnoses, nor is she the best source to provide an RFC opinion."  Objections at 5.  Gholston argues that when DDS sent him for another consultative examination, it was "not specifically to [n]urse Douglas, . . . no[r] specifically to anyone."  *Id.*  Gholston notes that DDS "paid almost the same price [for the second examination], suggesting that [it] did not pay a higher price in order to get a real physician instead of a nurse."  *Id.*  Gholston further observes that "[n]o doctor's name is on the request nor on the release form, and [Gholston does] not believe that anyone can read the signature on the ROM form."  *Id.*  This later examination is the Dr. Christiason Examination.  Gholston apparently does not believe that Dr. Christiason himself participated in the examination.  *Id.* at 5-6.  In support of this contention, Gholston notes that Akkerman, who is not an acceptable medical source, provided her electronic signature at the time that she recorded Gholston's vital signs, but Dr. Christiason did not provide his electronic signature until several hours later.  *Id.* at 5.  Thus, Gholston argues, "[n]o one can seriously claim that anything about this document supports any conclusion as to whether one, or the other, or both, actually performed the exam."  *Id.*  Gholston faults Judge Scoles for concluding that Dr. Christiason fully participated in the exam, arguing

---

[7] Gholston also contends that Judge Scoles incorrectly conflates the "substantial evidence" standard with the "substantial evidence on the record as a whole" standard. Objections at 4.  However, the court finds that Judge Scoles used the correct standard. Gholston correctly points out that the court must take into account evidence that fairly detracts from the ALJ's decision in addition to evidence that supports the decision.  *Id.* In his Report and Recommendation, Judge Scoles stated: "The Court not only considers the evidence which supports the ALJ's decision, but also the evidence that detracts from his or her decision."  Report and Recommendation at 4 (citing *Perks v. Astrue*, 687 F.3d 1086, 1091 (8th Cir. 2012); *Cox*, 495 F.3d at 617).

that such a conclusion is mere speculation. *Id.* at 6. In light of this, Gholston argues, because no acceptable medical source performed a consultative examination, the ALJ failed to develop the record and, as a consequence, there is not substantial evidence to support the ALJ's decision. *Id.*

In response, the Commissioner argues that the ALJ's consideration of Douglas's opinion was proper because "caselaw and regulations make plain that an ALJ may rely on a broad panoply of evidence from a variety of different sources, medical and nonmedical." Defendant's Brief at 11. She argues that, by considering Douglas's opinion along with other medical opinions and examinations, "the ALJ acted well within his purview as the factfinder by crafting an RFC assessment based on the record as a whole." *Id.* at 11-12. With respect to the issue of whether the ALJ failed to develop the record, the Commissioner argued that the ALJ satisfied this duty because "an ALJ need not take further action to develop the record where the evidence, despite certain inadequacies, is sufficient to permit a decision regarding whether the claimant is disabled." *Id.* at 13 (citing 20 C.F.R. §§ 404.1520(b) and 416.920(b)). Thus, the Commissioner argued, even if the consultative examinations were performed by a nurse practitioner rather than a medical doctor, the evidence was still sufficient to permit the ALJ to make a decision of whether Gholston is disabled. *Id.*

### 5. *Application*

Only "acceptable medical sources" can establish the existence of a medically determinable impairment, provide medical opinions and constitute "treating sources" entitled to special weight. *See* 20 C.F.R. §§ 404.1513(a), 404.1527(a)(2), 404.1527(d), 416.913(a), 416.927(a)(2), 416.927(d); SSR 06-03p, 71 Fed. Reg. 45,593-03, 45,594 (Aug. 9., 2006). However, evidence from "other sources," including other health care providers who are not acceptable medical sources, may be used "to show the severity of the [claimant's] impairment(s) and how it affects the [claimant's] ability to function." SSR

06-03p, 71 Fed. Reg. at 45,594; *see also* 20 C.F.R. §§ 404.1513, 416.913.  Though it is true that only acceptable medical sources are entitled to present medical opinions, Social Security Ruling 06-03p also states that opinions from "other medical sources," such as nurse practitioners, physician assistants, licensed clinical social workers, naturopaths, chiropractors, audiologists and therapists, are relevant to an ALJ's determinations of the claimant's "symptoms, diagnosis and prognosis, what the [claimant] can still do despite the impairment(s), and physical and mental restrictions." 71 Fed. Reg. at 45,595.  Thus, the regulations condone the use of other medical source opinions in determining the claimant's RFC and functional limitations.

The mere fact that the opinion comes from some other medical source is no reason to disregard it entirely and, in fact, "depending on the particular facts in a case, . . . an opinion from a medical source who is not an 'acceptable medical source' may outweigh the opinion of an 'acceptable medical source.'" *Id.* at 45,596.  For example, where the other medical source "has provided better supporting evidence and a better explanation for his or her opinion" than the acceptable medical source, the other source opinion may be entitled to greater weight. *Id.*  Factors to be considered in evaluating opinions from other sources include:

> [1] How long the source has known and how frequently the source has seen the individual; [2] [h]ow consistent the opinion is with other evidence; [3] [t]he degree to which the source presents relevant evidence to support an opinion; [4] [h]ow well the source explains the opinion; [5] [w]hether the source has a specialty or area of expertise related to the individual's impairment(s); and [6] [a]ny other factors that tend to support or refute the opinion.

*Id.* at 45,595.  When considering other source opinions, the ALJ must explain the weight he or she is giving to each opinion and, "when an adjudicator determines that an opinion from such a source is entitled to greater weight than a medical opinion from a treating source, the adjudicator must explain the reasons in the notice of decision in hearing cases."

*Id*. at 45,596.

In the instant action, the ALJ recognized that Douglas is a nurse practitioner and "not an acceptable medical source entitled to be given the same weight as a qualifying medical source opinion," thus her opinions were entitled to "less than significant weight." Administrative Record at 27. The ALJ found that Douglas's opinion was "generally supported by the evidence of record and [Gholston's] reported activities of daily living." *Id*. He also characterized Douglas's conclusions as "reasonable" and noted that "they do detail what [Gholston] is capable of performing despite his impairments." *Id*. Thus, in accordance with SSR 06-03p, the ALJ apparently considered factors two and three above in evaluating Douglas's opinion. Gholston argues that "Douglas is not an acceptable source to provide evidence of diagnoses, nor is she the best source to provide an RFC opinion." Objections at 5. However, SSR 06-03p permits the ALJ to consider other medical source opinions, including Douglas's, in considering Gholston's diagnoses. *See* 71 Fed. Reg. at 45,595. The court recognizes that Douglas, who is not an acceptable medical source, may not be the "best" source to inform the ALJ's RFC determination. However, the RFC need not be based solely on the "best" sources. Instead, the RFC must be supported by substantial evidence on the record as a whole. *Cf. Jones*, 619 F.3d at 971. It is not error to consider the Douglas Examination when considering the record as a whole. SSR 06-03p expressly permits it. Furthermore, the ALJ did not give controlling or even substantial weight to the Douglas Examination in rendering his RFC. Even if he had, the court finds that his explanation of the weight given to the Douglas Examination, and the reasoning behind it, is sufficient for purposes of SSR 06-03p. The court agrees with the ALJ insofar as Douglas's conclusions are generally consistent with the other evidence on the record and are generally supported by her findings at the examination. Accordingly, the court finds that the ALJ's consideration of the Douglas Examination was appropriate and not reversible error.

With respect to Gholston's claim that the ALJ erred in relying on the Dr. Christiason Examination, the court disagrees. Initially, the court notes that the record does not support Gholston's claim that DDS sent him "back to th[e] same clinic" after the Douglas Examination. Objections at 5. The Douglas Examination was performed at the Northeast Iowa Family Practice Center. Administrative Record at 554. The Dr. Christiason Examination was performed at Cedarloo Family Practice. *Id.* at 614. Gholston further complains that, when DDS sent him for the Dr. Christiason Examination, it must have been to nurse Akkerman because DDS paid almost the same price as for the Douglas Examination, "suggesting that they did not pay a higher price in order to get a real physician instead of a nurse." Objections at 5. The court refuses to engage in such speculation. Because the clinics were different, the court will not "price shop" between them and compare the prices they may have charged to perform consultative examinations, whether by a nurse or physician. Furthermore, the record reflects that nurse Akkerman recorded Gholston's vital signs at 9:54 a.m. on the date of the examination. Administrative Record at 621. She then provided her electronic signature on the report just one minute later at 9:55 a.m. *Id.* There is no evidence to suggest that Akkerman performed the entire examination herself. In fact, the presence of Dr. Christiason's signature on the report at all suggests that Akkerman did not perform the examination alone. It is true that Dr. Christiason did not sign the report until after normal business hours, at 6:02 p.m. *Id.* The court recognizes that this imply that Dr. Christiason did not actively participate in the examination, but there is no further evidence to support this implication, other than mere speculation. Thus, the court finds that the ALJ's apparent belief that the Dr. Christiason Examination was authored by the physician is supported by substantial evidence on the record. Accordingly, the court is bound to accept the ALJ's finding. *See Anderson v. Astrue*, 696 F.3d at 793; *Clay*, 417 F.3d at 928.

Furthermore, even if the Dr. Christiason Examination was performed by Akkerman,

who is not an acceptable medical source, the court would still find that the ALJ's consideration of the report was appropriate. As the court discussed at length above, opinions from other medical sources are appropriate to consider when rendering an RFC determination. *See generally* SSR 06-03p, 71 Fed. Reg. 45,593-03. The ALJ determined that the Dr. Christiason Examination was entitled to "little weight" because "[i]t appears Dr. Christiason relied primarily on [Gholston's] subjective complaints that have been found only partially credible." Administrative Record at 28. The ALJ also found that Dr. Christiason's conclusions "are inconsistent with the findings from his own evaluation of [Gholston]," citing the fact that Dr. Christiason failed to make many positive findings regarding Gholston's impairments. *Id.* "Furthermore, the overly restrictive limitations opined by Dr. Christiason are inconsistent with [Gholston's] own admission regarding his activities of daily living." *Id.*

The court finds that all of the ALJ's findings related to the Dr. Christiason Examination are supported by substantial evidence on the record. A review of the Dr. Christiason Examination reveals that the ALJ's observations about the report's findings are correct. *See* Administrative Record at 620-21. As for the weight the ALJ determined the Dr. Christiason Examination was entitled to receive, which was based primarily on Gholston's own credibility and admissions, the court is bound to defer to the ALJ's decision. *See Vester*, 416 F.3d at 889 (forbidding courts from re-weighing the evidence presented to an ALJ); *Gonzales*, 465 F.3d at 894 (providing that courts must generally defer to an ALJ's credibility findings); *Kirby*, 500 F.3d at 709 (holding that an ALJ is entitled to discount a medical opinion that was based largely on a claimant's subjective reports rather than medical evidence). Because even a source that is not an acceptable medical source can provide evidence "to show the severity of [a claimant's] impairment(s) and how it affects [the claimant's] ability to function," so long as the ALJ considers the relevant factors and discusses the weight given to the evidence, even if Akkerman was the

author of the Dr. Christiason Examination, the ALJ did not err in considering the report in rendering his RFC. SSR 06-03p, 71 Fed. Reg. at 45,594; *see also* 20 C.F.R. §§ 404.1513, 416.913. In short, the court is satisfied that the ALJ's consideration of the Dr. Christiason Examination, as a whole, is supported by substantial evidence on the record.

Finally, Gholston reminds the court that "RFC is a medical issue and the ALJ must rely on some medical evidence to support the RFC." Objections at 6. The court does not disagree with Gholston's statement of the law. *See Lauer v. Apfel*, 245 F.3d 700, 704 (8th Cir. 2001) (holding that the RFC determination is a medical question and that some medical evidence must support the ALJ's determination); *Miller v. Colvin*, 784 F.3d 472, 479 (8th Cir. 2015) (quoting *Lauer*, 245 F.3d at 704). However, "[e]ven though the RFC assessment draws from medical sources for support, it is ultimately an administrative determination reserved to the [agency]." *Perks*, 687 F.3d at 1092 (quoting *Cox*, 495 F.3d at 619-20). Gholston's contention that the ALJ "had no[]" medical evidence is incorrect. Objections at 6. Merely because the sources that Gholston questioned in his Objections may not be acceptable medical sources does not mean the ALJ erred in considering them in rendering his RFC. On the contrary, the regulations provide that a claimant's RFC will be assessed based on all medical sources, including other medical sources such as Douglas and Akkerman. *See* 20 C.F.R. §§ 404.1513, 404.1545, 416.913, 416.945 (providing that RFC determinations under both Title II and Title XVI will be based on "medical sources" and defining "medical sources" to include both acceptable source and other source evidence); *see also* SSR 06-03p, 71 Fed. Reg. at 45,594 ("The term 'medical sources' [in the regulations] refers to both 'acceptable medical sources' and other health care providers who are not 'acceptable medical sources.'"). The court finds that the ALJ's consideration of other medical source evidence was appropriate and provided the medical evidence necessary to support the RFC. Having addressed all of Gholston's objections pertaining

to the ALJ's RFC determination, the court finds that the ALJ's RFC determination, in its entirety, was supported by substantial evidence on the record as a whole. The court further finds that the ALJ properly dispatched his duty to fully and fairly develop the record. Accordingly, insofar as the ALJ's disability determination rested on Gholston's RFC, the court affirms.

### E. Vocational Evidence

#### 1. Background

At the administrative hearing, the ALJ posed several hypotheticals to the VE, Mitchell. *See* Administrative Record at 75-77. The hypotheticals were largely based on Gholston's RFC. *Id.* Initially, Mitchell identified three positions that Gholston could perform: document preparer, unskilled order clerk and addresser. *Id.* at 76. When the ALJ added the further restriction of "cognitively capable of simple, constant simple, repetitive tasks . . . [and] [n]o interaction with the public," Mitchell eliminated the order clerk position, but determined that a person with those limitations could still perform the document preparer and addresser positions. *Id.* at 77. Finally, when Gholston's counsel added the further limitation of "30 percent of the time failings to maintain persistence, concentration and pace," Mitchell testified that such a person could perform none of the positions previously indicated. *Id.* at 79.

Mitchell was also asked, both by the ALJ and Gholston's counsel, whether her opinion was inconsistent with the Dictionary of Occupational Titles' ("DOT") description of those jobs. The ALJ, Gholston's counsel and Mitchell engaged in the following exchange:

> ATTY: . . . How much use of the bilateral upper extremities would be required [for the addresser position]?
>
> VE: Well it's defined as frequent for the -- it doesn't distinguish as far as, you know, the bilaterally, it just says frequent use, for handling for

|         |                                                                                                                                                                           |
| ------- | ------------------------------------------------------------------------------------------------------------------------------------------------------------------------- |
|         | example or fine manipulation.                                                                                                                                              |
| ALJ:    | All right. So, so the question is I gave on hypotheticals two and three I said only occasional gross.                                                                      |
| VE:     | With the -- my understanding was the minor non-dominant.                                                                                                                   |
| ALJ:    | That's correct.                                                                                                                                                            |
| VE:     | In my opinion a person could still perform that job with my understanding of that limitation.                                                                              |
| ATTY:   | Does your opinion differ from the description contained in the *DOT* with respect to that point?                                                                          |
| VE:     | Well, it doesn't -- no to the point that it doesn't clarify that in the *Dictionary of Occupational Titles* and its supplements.                                          |
| ATTY:   | Same question with respect to the document preparer position. To what extent does that position require the use of bilateral upper extremities?                           |
| VE:     | Okay. Again it would be the frequent handle again, like fine manipulation. But it doesn't distinguish, you know, with both hands. In my opinion a person that could frequently use their dominant hand, you know, would be able to perform that job as well. But it doesn't distinguish in the *Dictionary of Occupational Titles* and its supplements. |
| ATTY:   | You say you're -- you don't believe your opinion differs from the *DOT* but would you say that you're supplementing information that's not in the *DOT*?                  |
| VE:     | Well I guess as I'm understanding or I would be utilizing, yes, my opinion as well.                                                                                       |

Administrative Record at 78-79. Mitchell further testified that there are 350 document preparer positions in Iowa and over 32,700 nationally, and that there are 200 addresser positions in Iowa and 25,000 nationally. *Id.* at 76.

**2.   *ALJ's decision***

After considering the VE's testimony at the hearing, and considering the positions

that the VE testified to at the hearing, the ALJ made the following conclusion with respect to Gholston's ability to perform work that exists in significant numbers in the national or regional economy: "Based on the testimony of the vocational expert, I conclude that, considering [Gholston's] age, education, work experience, and residual functional capacity, [Gholston] is capable of making a successful adjustment to other work that exists in significant numbers in the national economy." *Id.* at 31. The ALJ also found that "the vocational expert's testimony is consistent with the information contained in the Dictionary of Occupational Titles." *Id.* at 30.

### 3. *Report and recommendation*

Judge Scoles found that "the ALJ thoroughly considered and discussed both the medical evidence and Gholston's testimony in assessing Gholston's RFC" and that "the ALJ's findings and conclusions are supported by substantial evidence on the record as a whole." Report and Recommendation at 23. Thus, the ALJ's hypothetical questions, based on his findings and conclusions, "properly included those impairments which were substantially supported by the record as a whole" and were therefore proper. *Id.* Judge Scoles further found that Mitchell's explanations were adequate when she stated that her answers were not inconsistent with the DOT. *Id.* at 26. This, Judge Scoles found, comported with *Wheeler v. Apfel*, 224 F.3d 891 (8th Cir. 2000), in which the Eighth Circuit stated that:

> 'reliance on the DOT as a definitive authority on job requirements is misplaced . . . for DOT definitions are simply generic job descriptions that offer the approximate maximum requirements for each position, rather than their range.' . . .
> In other words, not all of the jobs in every category have requirements identical to or as rigorous as those listed in the DOT.

Report and Recommendation at 24 (quoting *Wheeler*, 224 F.3d at 897). Additionally, Judge Scoles found that the ALJ did not err in concluding that document preparer and

addresser jobs exist in significant numbers in the national economy. *Id.* at 26. In making this finding, Judge Scoles cited *Johnson v. Chater*, 108 F.3d 178 (8th Cir. 1997), in which the Eighth Circuit found that an occupation with only 200 positions was adequate to satisfy the step five requirement of a "significant number" of jobs. *Id.* Because the number of jobs available in the instant action, according to the VE, exceeds the number of positions in *Johnson*, Judge Scoles concluded that the ALJ did not err at step five. *Id.*

### 4. *Parties' arguments*

Gholston objects to Judge Scoles's finding that Mitchell's testimony provided substantial evidence to support the ALJ's decision that Gholston could perform work that exists in significant numbers in the national economy. He first argues that the hypothetical that the ALJ provided to Mitchell was flawed because the ALJ's RFC determination was incorrect. Objections at 6. Thus, he argues, the ALJ could not rely on Mitchell's opinion to provide substantial evidence at step five because the hypothetical posed, based on the ALJ's RFC determination, did not match Gholston's functional limitations. *Id.* He further argues that Mitchell's testimony was inconsistent with the DOT's descriptions of addresser and document preparer because Mitchell failed to reconcile her opinion that an individual could perform the document preparer and addresser jobs primarily with his or her dominant arm with the DOT's failure to address such a further limitation. *Id.* at 7. Gholston argues that the ALJ must reconcile the distinction between the VE's testimony and the DOT, "and he may not simply guess or flip a coin." *Id.* Finally, Gholston argues that the number of jobs that the VE claimed Gholston can perform is inadequate. *Id.* Gholston claims that 550 jobs is insufficient to meet the "significant numbers" requirement at step five of the five-part test. *Id.* In Plaintiff's Brief, Gholston points out that, in 2013, Iowa had a total of 1,593,700 jobs, and that the 550 jobs found by the VE constitutes only .0345% of those jobs. Plaintiff's Brief at 23-24. He further asserts that Judge Scoles misread *Johnson*, which Gholston argues does not state that the existence of 200 jobs is

categorically sufficient at step five. Objections at 7. He argues, "[i]n *Johnson* those [200] jobs were merely representative of a larger category of jobs that Johnson could perform, and in fact, Johnson was performing one of those jobs at the time." *Id.*

The Commissioner addresses several of these issues in Defendant's Brief. The Commissioner argues that Mitchell's testimony provides substantial evidence to support a disability determination with respect to step five. Specifically, she maintains that Mitchell's testimony is not inconsistent with the DOT, but merely supplements it by determining that a person could perform the jobs described, with the predominant use of one arm. Defendant's Brief at 15-16. Additionally, the Commissioner argues that the ALJ did not improperly determine that document preparer and addresser jobs exist in significant numbers in the national economy. *Id.* at 16. In support of this contention, she cites *Welsh v. Colvin*, wherein the Eighth Circuit held that the existence of 330 jobs in Iowa satisfies the "significant numbers" requirement. *Id.* (citing *Welsh v. Colvin*, 765 F.3d 926, 930 (8th Cir. 2014)). Therefore, the Commissioner argues, the existence of 550 document preparer and addresser jobs in Iowa also satisfies the requirement. *Id.* The Commissioner also notes that the "significant numbers" test asks whether a significant number of jobs exist in the national *or* regional economy. *Id.* Thus, even if the existence of 550 jobs in Iowa fails to satisfy the requirement, the existence of 57,700 jobs in the national economy should satisfy the requirement. *Id.* at 16-17.

### 5. *Application*

As an initial matter, the court rejects Gholston's contention that the VE's testimony could not provide substantial evidence because it was based on a hypothetical that does not reflect Gholston's functional limitations. The court, in considering Gholston's other objections, has detailed why the ALJ's RFC determination was supported by substantial evidence. Because the ALJ's hypothetical questions posed to the VE encompassed the functional limitations presented in Gholston's RFC, and because the ALJ's RFC

determination is supported by substantial evidence, the court finds that the ALJ's hypothetical questions were properly phrased and set forth. Accordingly, absent some other error, the hypothetical questions may serve to provide substantial evidence supporting the ALJ's disability determination at step five.

Where a VE testifies based on a properly phrased hypothetical question, such testimony constitutes substantial evidence supporting the ALJ's decision. *See Milam v. Colvin*, 794 F.3d 978, 985-86 (8th Cir. 2015) (citing *Cruze v. Chater*, 85 F.3d 1320, 1323 (8th Cir. 1996)); *Lacroix v. Barnhart*, 465 F.3d 881, 889 (8th Cir. 2006). A hypothetical need not include every impairment that the claimant complains of; rather, "[t]he ALJ's hypothetical question to the vocational expert needs to include only those impairments that the ALJ finds are substantially supported by the record as a whole." *Martise v. Astrue*, 641 F.3d 909, 927 (8th Cir. 2011) (quotation marks omitted) (quoting *Lacroix*, 465 F.3d at 889). "The point of the hypothetical question is to clearly present to the VE a set of limitations that mirror those of the claimant . . . [and] it need not use specific diagnostic or symptomatic terms where other descriptive terms can adequately define the claimant's impairments." *Roe v. Chater*, 92 F.3d 672, 676 (8th Cir. 1996) (citations omitted).

A VE's testimony is generally used in conjunction with occupational evidence from the DOT at step five of the five-part test to determine what jobs the claimant can perform. Social Security Ruling 00-4p explains that "[t]he term 'occupation,' as used in the DOT, refers to the collective description of . . . jobs. Each occupation represents numerous jobs." SSR 00-4p, 65 Fed. Reg. 75,759-01, 75,760 (Dec. 4, 2000). It also explains that "[t]he DOT lists maximum requirements of occupations as generally performed, not the range of requirements of a particular job as it is performed in specific settings. A VE . . . may be able to provide more specific information about jobs or occupations than the DOT." *Id.*; *see also Gieseke v. Colvin*, 770 F.3d 1186, 1189 (8th Cir. 2014) (finding that a VE properly found that, where the claimant suffered from an additional physical

limitation, the number of jobs available to the claimant based solely on the DOT should be reduced to accommodate that limitation).

The ruling also warns that "[o]ccupational evidence provided by a VE . . . generally should be consistent with the occupational information supplied by the DOT." SSR 00-4p, 65 Fed. Reg. at 75,760.

> When a VE . . . provides evidence about the requirements of a job or occupation, the adjudicator has an affirmative responsibility to ask about any possible conflict between that VE . . . evidence and information provided in the DOT. . . . If the VE's . . . evidence appears to conflict with the DOT, the adjudicator will obtain a reasonable explanation for the apparent conflict.

*Id.*; *see also Moore v. Colvin*, 769 F.3d 987, 989-90 (8th Cir. 2014); *Kemp ex rel. Kemp v. Colvin*, 743 F.3d 630, 633 (8th Cir. 2014) (finding that it was reversible error for the ALJ to fail to reconcile apparent inconsistencies between DOT listings and the claimant's physical abilities). The ALJ must do so "before relying on the VE . . . evidence to support a determination or decision about whether the claimant is disabled." SSR 00-4p, 65 Fed. Reg. at 75,760. "Neither the DOT nor the VE . . . evidence automatically 'trumps' when there is a conflict." *Id.* Instead, the VE and ALJ may rely on other sources to explain the conflict, such as information "available in other reliable publications, information obtained directly from employers, or from a VE's . . . experience in job placement or career counseling." *Id.* However, the Eighth Circuit has noted that:

> "reliance on the DOT as a definitive authority on job requirements is misplaced, . . . for DOT definitions are simply generic job descriptions that offer the approximate maximum requirements for each position, rather than their range." The DOT itself cautions that its descriptions may not coincide in every respect with the content of jobs as performed in particular establishments or at certain localities. In other words, not all of the jobs in every category have requirements

identical to or as rigorous as those listed in the DOT.

*Wheeler v. Apfel*, 224 F.3d 891, 897 (8th Cir. 2000) (citations omitted) (quoting *Hall v. Chater*, 109 F.3d 1255, 1259 (8th Cir. 1997)).

Here, contrary to Gholston's assertion, Mitchell did not testify that the addresser and document preparer positions could be performed "with only one arm." Objections at 7. Rather, Mitchell's testimony was that, where an individual has full functional capabilities in his dominant arm and has a limitation of "occasional gross" manipulation with his non-dominant arm, such an individual could perform the duties of an addresser or document preparer. *See* Administrative Record at 78-79. Mitchell also testified with regard to her opinion evidence's consistency with the DOT. *Id.* Mitchell stated that her testimony was not inconsistent with the DOT because the DOT does not distinguish between the functional capabilities of one's dominant arm alone and the functional capabilities of one's dominant arm together with his or her non-dominant arm. *Id.* Mitchell is correct insofar as the DOT does not indicate whether the positions she testified to can be performed primarily with the use of one's dominant arm. The DOT indicates that, for both positions, a claimant needs only low aptitude in motor coordination and finger dexterity and that each position requires frequent reaching, handling and fingering. Mitchell indicated that she was "utilizing . . . [her] opinion" when she testified that a person could perform those positions primarily with use of one's dominant arm. *Id.* Mindful that courts are not to rely on the DOT as the "definitive authority on job requirements," *Wheeler*, 224 F.3d at 897, and that VEs are entitled to "provide more specific information about jobs or occupations than the DOT," SSR 00-4p, 65 Fed. Reg. at 75,760, the court finds that Mitchell's testimony does not conflict with the DOT.

Supplementing the generic listings of the DOT with the VE's own expert opinion does not create a "conflict" for purposes of SSR 00-4p. A conflict generally occurs where the claimant's functional limitations as explained to the VE directly conflict with the listing

requirements in the DOT. In *Renfrow v. Astrue*, the Eighth Circuit found that there was no conflict between a claimant's "inability to do complex work and . . . inability to use [the claimant's] right hand for repetitive activity" and DOT listings that were classified as unskilled work that requires "frequent reaching and handling." 496 F.3d 918, 921 (8th Cir. 2007). The Eighth Circuit noted that the DOT listing's classification as "unskilled" make them "not appear to be 'complex.'" *Id.* The Eighth Circuit also found that jobs requiring "frequent reaching and handling" did not conflict with the claimant's limitation that she was unable to use her right hand for repetitive activity because "the frequent reaching and handling requirements are not equivalent to repetitive use of the right hand." *Id.*; *see also Moore*, 769 F.3d at 989-90 (noting a conflict between a claimant who could only "occasionally perform overhead reaching bilaterally" and a DOT listing that required "[f]requent[]" reaching with no directional specification); *Jones*, 619 F.3d at 977 (noting a conflict between a claimant who "could only occasionally handle" and a DOT listing that "require[s] frequent handling"); *Reynolds v. Barnhart*, 36 Fed. Appx. 575, 576 (8th Cir. 2002) ("The vocational expert's testimony did not contradict any information in the DOT; rather, it served as a supplement to that information."). Here, the ALJ's hypothetical questions provided for a restriction for "the left minor upper extremity no more than *occasional* gross manipulation." Administrative Record at 77 (emphasis added). It is true that the DOT listings require "frequent" reaching and handling. However, it is also true that the DOT does not specify a bilateral versus unilateral requirement for such reaching and handling, as Mitchell pointed out at the hearing. *Id.* at 78. The instant action is similar to *Renfrow* in that the frequent reaching and handling requirements in the DOT listings for the addresser and document preparer jobs are not necessarily equivalent to the frequent use of the left minor upper extremity for gross manipulation. *See* 496 F.3d at 921. Therefore, the ALJ could reasonably have concluded that there was no conflict between the hypothetical questions and the DOT listings. Accordingly, the court finds that

the ALJ's conclusion that, "[p]ursuant to SSR 00-4p, . . . the vocational expert's testimony is consistent with the information contained in the Dictionary of Occupational Titles" is supported by substantial evidence on the record.

The court also finds that there is substantial evidence to support the ALJ's conclusion that addresser and document preparer jobs exist in significant numbers in the national or regional economy. It is true that, in *Johnson v. Chater*, the Eighth Circuit found that 200 jobs in Iowa were sufficient at step five. 108 F.3d at 180. It is also true, as Gholston contends, that those 200 jobs were merely representative of a larger category of jobs that the claimant could perform, and that, at the time of the administrative hearing in that case, the claimant actually was performing one of those jobs. *Id.* However, in that case, "[t]he vocational expert did not give figures to describe the total number of unskilled, sedentary jobs in Iowa or the national economy." *Id.* The Eighth Circuit did not take issue with this or suggest that the failure to further define the total number of jobs the claimant could perform was erroneous, but instead relied on the 200 jobs that the VE identified and found that number to be sufficient at step five. *See id.* at 180 n.3 (suggesting that the court was rejecting Johnson's argument that 200 jobs in Iowa is not a significant number). Thus, the court finds that *Johnson* controls the instant action, and that Gholston's contention that "[t]he [*Johnson*] [c]ourt did not say that 200 jobs is sufficient to meet the burden" is incorrect. Objections at 7. Accordingly, the court finds that the ALJ's conclusion that a significant number of jobs that Gholson can perform exist in the national or regional economy is supported by substantial evidence on the record.

However, even if the court's reading of *Johnson* is incorrect, it would still find that the ALJ's finding at step five is supported by substantial evidence. In *Welsh v. Colvin*, the Eighth Circuit held that, where there are 330 positions regionally and 36,000 positions nationally, there are a sufficient number of jobs to satisfy the "significant numbers" requirement. *See* 765 F.3d at 930 (holding that where the VE "testi[fied] that 330 . . .

jobs exist in Iowa, and [that the claimant] could perform 'most' of those jobs. . . . substantial evidence supports the ALJ's finding that a sufficient number of jobs existed in the national and local economies that a person with [the claimant's] RFC could perform."). Here, Mitchell testified that 550 positions exist in Iowa and 57,700 positions exist nationally. These numbers fall well within the bounds set forth by the Eighth Circuit in *Welsh*. Because the court will "ultimately leave to the [ALJ's] common sense the application of the significant numbers requirement to a particular claimant's factual situation," *Hall v. Chater*, 109 F.3d 1255, 1259 (8th Cir. 1997), the court concludes that the ALJ's finding that Gholston is capable of performing work that exists in significant numbers in the national economy is supported by substantial evidence on the record as a whole. Accordingly, the court affirms.

### VI. CONCLUSION

For the foregoing reasons, it is hereby **ORDERED**:

(1)     The Objections (docket no. 16) are **OVERRULED**;

(2)     The Report and Recommendation (docket no. 15) is **ADOPTED**; and

(3)     The Complaint (docket no. 3) is **DISMISSED WITH PREJUDICE**.

**IT IS SO ORDERED**.

**DATED** this 21st day of October, 2015.

LINDA R. READE
CHIEF JUDGE, U.S. DISTRICT COURT
NORTHERN DISTRICT OF IOWA